**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **DAISHA WATSON,** | * | |
| **Plaintiff,** | * | |
| v. | | **Case No.: GJH-20-2578** |
| | * | |
| **HOMEBRIDGE FINANCIAL SERVICES, INC.,** | | |
| | * | |
| **Defendant.** | | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM OPINION**

Plaintiff Daisha Watson brought this civil action alleging that Defendant, as her servicer, mishandled her mortgage by wrongfully denying her loss mitigation applications, misapplying payments, and failing to convey her escrowed homeowners' insurance premiums in violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq*., the Maryland Consumer Debt Collection Act (the "MCDCA"), Md. Code Ann., Com. Law § 14-201 *et seq*., and the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law § 13-101 *et seq*. Pending before the Court is Defendant's Motion to Dismiss Plaintiff's Amended Complaint. ECF No. 16. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the following reasons, Defendant's Motion to Dismiss Plaintiff's Amended Complaint is granted, in part, and denied, in part.

1

## I.     BACKGROUND[1]

### A.  Factual Background

In or around late 2014, Plaintiff's grandmother, Hope Williams, passed away and, in her will, left Plaintiff her home located at 4796 Towne Square Blvd., Suitland, MD 20746 (the "Home"). ECF No. 15 ¶¶ 8–9. Plaintiff's grandmother also named Plaintiff as the executor and personal representative of her estate. *Id.* ¶ 10. When Plaintiff inherited the Home from her grandmother, "it was encumbered by an FHA-insured mortgage (the "Mortgage") serviced by Cenlar FSB ("Cenlar")". *Id.* ¶ 11. Plaintiff made timely and regular payments on the Mortgage to Cenlar and provided documents relating to her status as her grandmother's successor-in-interest, *id.* ¶ 12, and on October 15, 2015, Cenlar transferred the servicing of the Mortgage to Defendant, with servicing based out of Defendant's office in Kennesaw, Georgia. *Id.* ¶ 13. Around the time of the service transfer, Plaintiff had a baby, and her brother was murdered, which caused "significant financial strain on Plaintiff," including falling behind on her mortgage. *Id.* ¶¶ 14–15.

Plaintiff alleges that she initially reached out to Defendant about loss mitigation options in or around 2016, but that Defendant did not provide her with any information beyond directing her to pay the entire outstanding balance in a lump sum. *Id.* ¶ 16. Then, in or around July 2017, Plaintiff submitted a loss mitigation application to Defendant, *id.* ¶ 17, and she alleges that though she had "previously provided all required documents, Defendant repeatedly demanded that she resubmit them." *Id.* ¶ 18. Plaintiff alleges that she submitted documents that included proof of her successor-in-interest status and that her application was complete no later than September 27, 2017. *Id.* ¶¶ 19–20. On or about October 26, 2017, Plaintiff alleges that Defendant

---

[1]Unless otherwise stated, the background facts are taken from Plaintiffs' Amended Complaint, ECF No. 15, and are presumed to be true. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

rejected her application because she was not the named borrower, though Plaintiff alleges that she "provided multiple indications of her assumption of the Mortgage and her successor-in-interest status." *Id.* ¶ 21.[2]

In or around February 2018, Plaintiff alleges that Defendant initiated a non-judicial foreclosure on the Home, *id.* ¶ 23, and that the loss mitigation affidavit accompanying the foreclosure paperwork "falsely stated that Plaintiff had not submitted a complete application," when Plaintiff alleges that she submitted all requested documentation. *Id.* ¶ 24. Plaintiff then, with the assistance of a housing counselor, submitted another loss mitigation application in or around March 2018, and entered into a "trial payment plan for a modification," which halted the foreclosure proceedings. *Id.* ¶ 25. Plaintiff alleges that she made all payments in a timely manner and pursuant to the trial payment plan, and that she followed up with Defendant multiple times regarding a permanent loan modification agreement. *Id.* ¶ 26. Plaintiff further alleges that Defendant failed to provide her with a final loan modification agreement or a notice of denial for a permanent loan modification, though nothing changed regarding Plaintiff's eligibility for a modification, and Defendant did not request additional documentation for the application. *Id.* ¶¶ 27–29. Plaintiff continued to make payments "in the trial amount" while awaiting the permanent modification agreement from Defendant. *Id.* ¶ 30.

On or about January 16, 2019, Defendant transferred servicing of the Mortgage internally to its office in Ewing, New Jersey, and Plaintiff alleges that the notice "explicitly stated that '[if] you are currently in a loss mitigation workout program, the workout program will remain active. HomeBridge Financial Services Inc. will decision [sic] any workout requests that have not been

---

[2] Plaintiff alleges that modifications are "available to heirs, such as Plaintiff, notwithstanding the fact that her name was not on the note[,]" and cites to the FHA Single Family Housing Policy Handbook. ECF No. 15 ¶ 22.

approved as of the transfer date.'" *Id.* ¶¶ 31–32. Plaintiff alleges that, after this transfer, "Defendant failed to provide its New Jersey office with access to information related to Plaintiff's in-progress modification" and failed to send Plaintiff her final modification paperwork. *Id.* ¶ 33.

In or around February 2019, Defendant sent Plaintiff a check for $ 7,017.82 (the "Rejected Payments"), thus returning Plaintiff's trial payments "as purportedly insufficient to cure the delinquency." *Id.* ¶ 34. Plaintiff contends that she did not deposit the check because she properly paid the funds towards the Mortgage and that Defendant "began refusing Plaintiff's subsequent payments," which rendered her further delinquent though she complied with the obligations set forth by Defendant. *Id.* ¶¶ 35–36. In or around the same month, Plaintiff alleges that Defendant restarted foreclosure proceedings on the Home by scheduling a foreclosure sale on March 26, 2019, which Defendant only agreed to postpone after "significant effort" by Plaintiff and her housing counselor. *Id.* ¶¶ 37–38. Around one month later, on or about March 29, 2019, Plaintiff, through her counsel, sent Defendant a Notice of Error and Qualified Written Request, to the address designated by Defendant. *Id.* ¶ 39. Plaintiff's Notice of Error included her "name, address, and account number, described Defendant's failure to honor the pending loan modification following the service transfer, [and] requested that the error be corrected." *Id.* ¶ 40.

Almost two months later, on or about May 21, 2019, Defendant responded to Plaintiff's Notice of Error, "admitting that it had failed to properly transfer loan modification documents from its Georgia office to its New Jersey office." *Id.* ¶ 41. Plaintiff alleges that she was finally able to secure a permanent loan modification on or about June 27, 2019, but that she "suffered significant distress and lost productivity in the interim." *Id.* ¶ 42. This June 2019 loan

4

modification agreement also provided for the collection of escrow funds, to be paid by Defendant, to Plaintiff's homeowners' insurance company, and her monthly mortgage statements for each month of 2020 purported to include the collection of an escrow amount of this insurance, as well as property taxes. *Id.* ¶¶ 66–67. Plaintiff alleges that she paid all escrow amounts required from at least the effective date of the June 27, 2019 loan modification agreement. *Id.* ¶ 68. Additionally, throughout the processing of securing the final loan modification, Plaintiff informed Defendant that she did not deposit the Rejected Payments and that she wanted them reapplied to her balance, which Defendant agreed to do, but the modified balance "did not reflect application of the Rejected Payments." *Id.* ¶¶ 43–44. Plaintiff alleges that "with the threat of wrongful foreclosure still lingering, [she] executed the final agreement," *id.* ¶ 45, and as of the effective date of the permanent loan modification, Plaintiff alleges that her mortgage "should have been deemed current, with no past due balance." *Id.* ¶ 46.

Moreover, Plaintiff alleges that after she signed the final agreement, Defendant stopped payment on the check for the Rejected Payments, but failed to apply the funds to the Mortgage, despite Plaintiff's requests to do so. *Id.* ¶ 47. Plaintiff then timely paid her mortgage each month following the execution of the final loan modification, but notwithstanding this modification, the "late-applied Rejected Payments," and Plaintiff's on time payments since the modification, Plaintiff further alleges that Defendant still sent her "multiple" mortgage statements identifying her as "thousands of dollars past due." *Id.* ¶¶ 48–49. Plaintiff contends that she directly, or through her counsel, contacted Defendant in or around September 2019 to request the application of the Rejected Payments, and Defendant told Plaintiff that the funds would be applied, though Defendant "failed to adjust either the principal balance or the purported delinquent balance listed on Plaintiff's mortgage statements. *Id.* ¶¶ 50–51. On or about November 25, 2019, Plaintiff,

though counsel, sent a second Notice of Error to the address designated by Defendant, which again included Plaintiff's name, address, account number, and the disputed erroneous delinquency balance. *Id.* ¶¶ 52–53. Then, on or about December 23, 2019, Defendant, through its subservicer, responded to Plaintiff's Notice of Error by, as Plaintiff alleges, "detailing a convoluted history of applications, reversals, and reapplications of Plaintiff's payments." *Id.* ¶ 54. Defendant's Notice of Error Response also indicated that the rejected payments had been applied to Plaintiff's July, August, September, October, November, and December 2019 payments, though Plaintiff alleges that she had already made these payments. *Id.* ¶ 55. Plaintiff contends that this response indicates that Defendant's investigation "did not properly and adequately address the errors raised in the November 2019 Notice of Error." *Id.* ¶ 56.

When Plaintiff next followed up with Defendant in or around January 2020, the representative told Plaintiff that the next payment due was for February 2020, which Plaintiff alleges was timely paid, and based on the representative's statements, Plaintiff did not make a payment in January 2020, but alleges that she "had double-paid for each of the preceding six months." *Id.* ¶¶ 57–58. Plaintiff alleges that despite this admission of some error and promise to correct it, Defendant, either directly or through its subservicer, indicated that Plaintiff owed a past due balance in excess of $5,000. *Id.* ¶ 59. In or around October 2020, Plaintiff contacted her homeowner's insurance company and was informed that her policy was cancelled in April 2020 due to nonpayment of the premiums, and Plaintiff alleges that Defendant failed to properly convey her escrowed premiums to the insurance company. *Id.* ¶¶ 69–70. In or around the same month, Plaintiff, through counsel, notified Defendant of the "erroneous failure to properly pay the escrowed premiums, but Plaintiff alleges that, to date, the policy has not been reinstated." *Id.* ¶ 71. Plaintiff further contends that because she is already making monthly payments to

Defendant "that should be applied to homeowners' insurance premiums," she cannot afford to pay a second set of premiums for replacement insurance. *Id.* ¶ 72. Plaintiff does provide that, since alerting Defendant to the error with the insurance payments, she has received multiple "General Change Endorsements" from Cenlar's Insurance Processing Center, "leading her to believe that Defendant has taken the steps necessary to reinstate the wrongfully unpaid policy." *Id.* ¶ 73. However, on or about February 2, 2021, Plaintiff alleges that Defendant sent her a letter "indicating its intent to purchase force-placed insurance" to replace the policy Plaintiff alleges Defendant had caused to lapse. *Id.* ¶ 74.

On or about December 2020, Defendant, through Cenlar, informed Plaintiff in writing that she met the requirement for the termination of her mortgage insurance, *id.* ¶ 61, and Plaintiff alleges that had Defendant properly applied her previous payments, she would have met the requirements earlier, thus saving her several months of "unnecessary premiums." *Id.* ¶62. Plaintiff alleges that as of her January mortgage statement, Defendant continued to insist that she owed nearly $6,000. *Id.* ¶ 63. By January 26, 2021, Plaintiff alleges that Defendant wrongly, through Cenlar, informed Plaintiff that she was "in default under the terms of [her] mortgage" and that it was within Defendant's right "to invoke foreclosure based on the terms of [her] mortgage contract." *Id.* ¶ 64. When Plaintiff attempted to make her February mortgage payment, Defendant informed her that she could no longer access any automated systems and, instead, had to speak with a representative to do so, which Plaintiff alleged cost her significant time. *Id.* ¶ 65.

Plaintiff alleges that "as a result of Defendant's violations and the resulting threats of imminent foreclosure, [she] suffered severe emotional distress," manifesting through symptoms including depression, anxiety, loss of sleep, crying, and chest pains, which she further alleges has been exacerbated by Defendant's continued insistence that she is delinquent, the failure to

properly maintain her homeowners' insurance and the threats of foreclosure and implementing "force-placed insurance." *Id.* ¶¶ 76–78. Additionally, Plaintiff contends that she regularly received "inquiries from speculators looking to purchase her home," which she found humiliating and upsetting, and that she was forced to take time off work to address Defendant's ongoing servicing failures, causing an impact on her job performance. *Id.* ¶¶ 79–80. On or about May 6, 2020, Plaintiff, "motivated solely by the fear of foreclosure due to Defendant's persistent inaccurate delinquency characterization," filed a Chapter 13 bankruptcy petition in the Bankruptcy Court of the District of Maryland, causing "substantial harm to her ability to secure credit." *Id.* ¶ 81. Plaintiff contends that she inadvertently omitted the instant case from her bankruptcy schedule, but that she has since amended the schedule to correct the error. *Id.* ¶ 81 n.1.

### B.  Procedural Background

Plaintiff filed a Complaint against Defendant in this Court on September 7, 2020, ECF No. 1, which Defendant answered on November 30, 2020. ECF No. 7. Defendant filed an amended Answer on December 21, 2020. ECF No. 9. The parties submitted a Joint Motion to Continue Rule 16 Conference on February 17, 2021, ECF No. 13, in which the parties detailed that on January 13, 2021, Plaintiff amended the schedules in her Chapter 13 bankruptcy to include some or all of the claims in her Complaint, *id.* ¶ 3, and Defendant consented to Plaintiff's request for consent to file an amended complaint, *id.* ¶ 6. The Court granted the Joint Motion to Continue on February 22, 2021. ECF No. 14. Plaintiff, in accordance with the terms set forth in the parties' Joint Motion to Continue, filed an Amended Complaint on February 22, 2021. ECF No. 15. On March 8, 2021, Defendant filed a Motion to Dismiss Plaintiff's Amended Complaint,

ECF No. 16, which Plaintiff opposed on March 22, 2021, ECF No. 17. Defendant replied on April 12, 2021. ECF No. 19

## II.      STANDARD OF REVIEW

To state a claim that survives a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012). The Court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The Court must also "draw all reasonable inferences in favor of the plaintiff." *Id.* at 253 (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). "[B]ut [the Court] need not accept the legal conclusions drawn from the facts, and . . . need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Id.* (first alteration in original) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

"Under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider exhibits, without converting the motion to dismiss to one for summary judgment." *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 501 (D. Md. 2019) (citing *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015)). "In particular, a court may consider documents that are 'explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits . . . .'" *Id.* (ellipsis in original) (quoting *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016)). The Court may also "consider a document submitted by

the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166. "To be integral, a document must be one that by its very existence, and not the mere information it contains, gives rise to the legal rights asserted." *Brennan*, 361 F. Supp. 3d at 502 (emphasis and internal quotation marks omitted) (quoting *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)).

## III.    DISCUSSION

In the Amended Complaint, Plaintiff alleges violations of RESPA (Counts I–II), a violation of the MCDCA (Count III), and a violation of the MCPA (Count IV). ECF No. 15. In the pending motion, Defendant seeks to dismiss the entirety of the Amended Complaint based on (1) judicial estoppel, (2) Plaintiff's lack of standing with respect to the RESPA claim, and (3) Plaintiff's failure to state a claim under the MDCA and MCPA. ECF No. 16-1 at 2.[3] The Court will address each argument in turn.

### A.  Judicial Estoppel

"[J]udicial estoppel is an equitable doctrine, designed to 'protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Martineau v. Wier*, 934 F.3d 385, 393 (4th Cir. 2019) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001)). Typically, the doctrine is "reserved for cases where the party to be estopped . . . has taken a later position that is clearly inconsistent with [the] earlier one; has persuaded a court to adopt the earlier position, creating a perception that either the first or the second court was misled; and would derive an unfair advantage or impose

---

[3] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

an unfair detriment on the opposing party if not estopped." *Martineau*, 934 F.3d at 393 (internal

quotation marks omitted). And "there is the longstanding principle that judicial estoppel applies

only when 'the party who is alleged to be estopped *intentionally* misled the court to gain unfair

advantage,' and not when 'a party's prior position was based on inadvertence or mistake.'" *Id.*

(quoting *John S. Clark Co.,* 65 F.3d at 29) (emphasis in original); *accord New Hampshire*, 532

U.S. at 753 (quoting *John S. Clark*, 65 F.3d at 29).

The Fourth Circuit has identified three criteria that must be present for judicial estoppel

to apply including: (1) "the party sought to be estopped must be seeking to adopt a position that

is inconsistent with a stance taken in prior litigation" and that "the position sought to be estopped

must be one of fact rather than law or legal theory;" (2) "the prior inconsistent position must

have been accepted by the court;" and (3) "the party sought to be estopped must have

intentionally misled the court to gain unfair advantage." *Lowery v. Stovall*, 92 F.3d 219, 223–24

(4th Cir. 1996) (internal quotation marks omitted).

Defendant argues that all three criteria are met. With respect to the first criteria,

Defendant argues that "Plaintiff took a position (upon advice of counsel) in the Bankruptcy that

is inconsistent with the pendency of the instant litigation," and one that is based in fact as

opposed to law. ECF No. 16-1 at 7. Specifically, that "Plaintiff advised the Bankruptcy Court

that she had no claims against third parties 'whether or not [she had] filed a lawsuit or made a

demand for payment" and that "she had no other 'contingent and unliquidated claims of every

nature, including counterclaims of the debtor and rights to set off claims'" *Id.* at 6–7; ECF No.

16-3 at 5–6 (Plaintiff's Official Form 106 A/B identifying no claims against third parties but

identifying other contingent and uniqified claims, including the claims in the instant suit.).

Second, that the bankruptcy court accepted Plaintiff's representations by entering her Chapter 13

11

bankruptcy plan. *Id.* at 7; ECF No. 16-3 (Plaintiff's Chapter 13 plan). Regarding the first two criteria, Plaintiff responds by arguing that the amendment of her bankruptcy schedules eliminates any inconsistency in her position because the amendments occurred "while her bankruptcy remained open, [thus] superseding any prior contrary judicial determination and eliminating any risk of inconsistent determinations." ECF No. 17 at 8–9.

"Judicial estoppel has often been applied to bar a civil law suit brought by a plaintiff who concealed the existence of the legal claim from creditors by omitting the lawsuit from his bankruptcy petition." *Whitten v. Fred's, Inc.*, 601 F.3d 231, 241 (4th Cir. 2010*), abrogated on other grounds by Vance v. Ball State Univ.*, 570 U.S. 421 (2013). The Fourth Circuit in *Martineau v. Wier*, 934 F.3d 385, 397 (4th Cir. 2019) analyzed the applicability of judicial estoppel in the context of bankruptcy and noted that "once [plaintiff] reopened her bankruptcy proceedings and corrected her disclosures, it is at least arguable that she was taking the same position – that she had valid legal claims against the defendants – before both courts, and that the bankruptcy court, by accepting the amended disclosures and granting a new discharge, was no longer crediting the initial position." *Id.* On remand, the United States District Court for the District Court of South Carolina in *Martineau* declined to apply judicial estoppel, in part, because "Plaintiff ultimately realized no success in persuading the bankruptcy court to accept an inconsistent position" as the plaintiff "amended her bankruptcy schedule as soon as the issue was raised by Defendants." *Martineau v. Wier*, 485 F. Supp. 3d 637, 643 (D.S.C. 2020). The same is true in the instant case. Here, Plaintiff amended her bankruptcy petition while her bankruptcy remained open, which the bankruptcy court accepted without issue. *See* ECF No. 15 ¶ 81 n.1; ECF No. 17 at 9; ECF No. 16-4 (Plaintiff's Amended Chapter 13 plan); *see also O'Hara v. Nika Techs., Inc.*, No. 13-cv-543-PW, 2015 WL 993572, at *5 (D. Md. Mar. 4, 2015) (holding that

exercise of judicial estoppel not warranted where plaintiff amended bankruptcy schedules, where action was still pending, because no creditors were harmed by delay and no indication of intent to deceive court). Therefore, "[t]here is no risk of inconsistent judicial determinations as between this action and Plaintiff's bankruptcy case."[4] *Martineau*, 485 F. Supp. 3d at 643.

Turning to the third consideration: whether Plaintiff "intentionally misled the court to gain unfair advantage," the primary consideration is one of intent. *See Lowery*, 92 F.3d at 224. The Fourth Circuit in *Martineau* "recently admonished against a presumption of bad faith merely because the debtor had knowledge of the potential claim but did not disclose it." *Angelini v. Baltimore Police Dep't*, 464 F. Supp. 756, 785 (D. Md. 2020) (citing *Martineau*, 934 F.3d at 394). Specifically, the Fourth Circuit found that a district court's improper application of a presumption of bad faith "is at odds with our case law and with the very nature of judicial estoppel." *Martineau*, 934 F.3d at 393. This is because "[s]uch a presumption could "give the civil defendant a windfall." *Id*. at 394 (internal quotation and citation omitted). Instead, the Fourth Circuit instructed that the applicability of judicial estoppel "depends on the 'specific factual context[ ]' of a case, rather than 'any general formulation' or 'inflexible' rule or standard." *Martineau*, 934 F.3d at 394 (bracket in original and citation omitted). "In other words, the analysis is case-specific and knowledge of a potential undisclosed claim is not synonymous with intent to manipulate the judicial system." *Angelini v. Baltimore Police Dep't*, 464 F. Supp. 3d at 785.

Plaintiff concedes that the instant litigation was not listed in her original bankruptcy petition as she acknowledges that she amended her petition, ECF No. 15 ¶ 81 n.1, and argues that

---

[4] Defendant also takes issue with the fact that Plaintiff amended her bankruptcy schedules only after it advised Plaintiff in January 2021, *see* ECF No. 19 at 3–4, but as the *Martineau* court on remand noted, once she amended her schedules without issue, "Plaintiff is no longer taking inconsistent factual positions, and the bankruptcy court ultimately did not accept Plaintiff's initial position." *See Martineau*, 485 F. Supp. 3d at 645.

because the bankruptcy court "allowed amendment without taking any punitive action indicates both that it did not find bad faith and that no deception occurred." ECF No. 17 at 9. "Bankruptcy courts have multiple ways of protecting their own integrity against fraudulent nondisclosures." *Martineau*, 934 F.3d at 395 (citing *Ah Quin v. Cty. of Kauai Dep't of Transp.*, 733 F.3d 267, 275 (9th Cir. 2013) (rejecting presumption of bad faith in part because "the bankruptcy system already provides plenty of protections" to bankruptcy courts to guard against threats to their integrity)). That the bankruptcy court did not use any of the tools at its disposal "to guard against threats" including, for example, the imposition of sanctions against Plaintiff, *see* Fed. Bankr. R. P. 9011(c), is "a strong indication that it did not believe that [Plaintiff] acted in bad faith." *See Martineau*, 934 F.3d at 396. Further, "presuming bad faith from failure to disclose a legal claim is particularly unwarranted in a case like this one, in which there was no 'pending lawsuit' to disclose when the debtor filed for bankruptcy." *Martineau*, 934 F.3d at 395. Here, when Plaintiff filed for bankruptcy on May 6, 2020, ECF No. 16-2 at 8, she had not yet filed the civil suit, and she would not until four months later when Plaintiff filed her first Complaint the instant case on September 7, 2020. ECF No. 1.

Moreover, Defendant offers nothing demonstrating intent to deceive other than sternly worded, unsupported accusations, which the Court finds unconvincing. *See* ECF No. 19 at 3–4. At this stage, absent any presumption of bad faith, with no additional evidence bearing on the issue of Plaintiff's intent to mislead, and the three criteria not satisfied, the Court will not apply judicial estoppel to Plaintiff's claims.

### B. RESPA

Plaintiff alleges violations of the Real Estate Settlement Procedures Act ("RESPA") in Counts I–II of the Amended Complaint. *See* ECF No. 15 ¶¶ 82–99. "Congress enacted RESPA to

protect consumers from 'unnecessarily high settlement charges caused by certain abusive practices' in the real estate mortgage industry, and to ensure 'that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process.'" *Robinson v. Nationstar Mortg. LLC*, No. 14-cv-3667-TDC, 2019 WL 4261696, at *5 (D. Md. Sept. 9, 2019) (citing 12 U.S.C. § 2601(a)). "RESPA's implementing regulations, codified at 12 C.F.R. §§ 1024.1 to 1024.41 and known as 'Regulation X,' *see* 12 C.F.R. § 1024.1, prescribe additional duties and responsibilities of mortgage servicers under RESPA." *Id.* Regulation X went into effect on January 10, 2014. Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act ("Regulation X"), 78 Fed. Reg. 10696, 10708 (Feb. 14, 2013) (codified at 12 C.F.R. Part 1024). And Regulation X imposes additional duties and responsibilities on mortgage servicers under RESPA. *See id.*

Under RESPA, "[w]hoever fails to comply with any provision of this section shall be liable to the *borrower* for each such failure [.]" 12 U.S.C.A. § 2605(f) (emphasis added). Therefore, under 12 U.S.C. § 2605(f), only borrowers can enforce the provisions of Regulation X. *See* 12 C.F.R. § 1024.41(a); *Robinson*, 2019 WL 4261696, at *6. In determining whether an individual is a "borrower" for the purposes of RESPA, "[c]ourts have held that a person who did not sign the promissory note is not a 'borrower' for the purposes of RESPA because that individual has not 'assumed the loan.'" *Robinson*, 2019 WL 4261696, at *6 (citing *Nelson v. Nationstar Mortg. LLC*, No. 16-0307, 2017 WL 1167230, at *3 (E.D.N.C. Mar. 28, 2017) (collecting cases)).

Defendant argues that Plaintiff's RESPA claims fail because "the mortgage loan was in the name of Plaintiff's deceased grandmother, Hope Williams." ECF No. 16-1 at 10. But the analysis here is not so simple. However, as of April 2018, Regulation X states that "[a]

confirmed successor in interest shall be considered a borrower for purposes of . . . this subpart." 12 C.F.R § 1024.30(d); *see also Amendments to the 2013 Mortgage Rules Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z)*, 81 Fed. Reg. 72,160-01, 72,167–68 (October 19, 2016) (codified at 12 C.F.R. pts. 1024 & 1026). And a "confirmed successor in interest means a successor in interest once a servicer has confirmed the successor in interest's identity and ownership interest in a property that secures a mortgages loan subject to this subpart." 12 C.F.R § 1024.31. Thus, the inquiry relevant to determining whether Plaintiff's RESPA claims survive is whether and when she became a confirmed successor in interest. Plaintiff appears to summarily conclude that she is a successor in interest because she "had provided sufficient proof of her status as a successor in interest to the estate of her grandmother." ECF No 17 at 15. But "[t]he assertion that Plaintiff[] [is a "borrower"] pursuant to RESPA is a legal conclusion that may be properly resolved on a motion to dismiss." *Kelly v. Nationstar Mortg., LLC*, No. 2:20-CV-24, 2020 WL 6790989, at *2 (E.D. Va. July 14, 2020) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Although for the purposes of a motion to dismiss we must take all factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'")).

Plaintiff, throughout the Amended Complaint, reiterates that she "submitted proof" of her successor in interest status, *see* ECF No. 15 ¶¶ 12, 19, 21, 84, but, by Plaintiff's own admission, her loss mitigation application, which "included proof of her status as a successor in interest," was submitted in September 2017, which is over six months before the April 2018 amendments to Regulation X went into effect. *See Id.* ¶ 84. As such, Section 2605(f) cannot support Plaintiff's claim that she is a successor in interest for two reasons: first, because her claim predates the

16

effect date of the April 2018 amendments, *see Keen v. Helson*, 930 F.3d 799, 805 (6th Cir. 2019) (noting "that is the end of the matter" where Plaintiff "acknowledges that these regulations do not apply to her directly because they became effective in April 2018, after the events that led to her lawsuit,") and, second, because the mere submission of proof does not confer upon Plaintiff a status of confirmed successor of interest, *see* 81 Fed. Reg. 72,160-01, 72,175 ("[T]he final rule does not provide potential successors in interest a private right of action or notice of error procedure for claims that a servicer made an inaccurate determination about successorship status or failed to comply with § 1024.36(i) or § 1024.38(b)(1)(vi).").

Defendant concedes that the permanent loan modification it entered into with Plaintiff on July 8, 2019 "confirm[ed] her status with [Defendant] as a successor in interest to the original borrower." ECF No. 19 at 5; ECF No. 19-2 (executed loan modification agreement). Because only confirmed successors in interest are considered borrowers for RESPA purposes, 12 C.F.R § 1024.30(d), Plaintiff's claims that predate Defendant's confirmation of her status as a successor in interest fail to state a claim.[5] In Count I of the Amended Complaint, Plaintiff alleges acts and omissions that predate her confirmation as successor in interest, *see* ECF No. 15 ¶¶ 83–91, and leaves ambiguous the timing as to the allegations at ¶¶ 92–93. As such, Plaintiff's claims fail to state a cognizable claim upon which relief can be granted, and the Court will grant Defendant's Motion to Dismiss as to Count I of the Amended Complaint, without prejudice.[6]

---

[5] This moots Plaintiff's argument that by "providing a trial loan modification in March 2018, Defendant appears to have confirmed Plaintiff's status as a successor in interest." ECF No. 17 at 15.

[6] To the extent that Plaintiff believes these defects may be corrected, specifically if she can clarify the ambiguous dates such that those claims may survive, Plaintiff may move for leave to amend within 14 days. Failure to do so will result in dismissal of these counts with prejudice.

### C.  MCDCA

Plaintiff asserts a violation of Section 14-202(8) of the MCPA. *See* ECF No. 15 ¶¶ 100–105. Pursuant to the MCDCA, a debt collector may not "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist." Md. Code, Com. Law § 14-202(8). To plausibly allege violation of this provision, a plaintiff "must set forth factual allegations tending to establish two elements: (1) that Defendants did not possess the right to collect the amount of debt sought; and (2) that Defendants attempted to collect the debt knowing that they lacked the right to do so." *Amenu-El v. Select Portfolio Servs.*, No. 17-cv-2008-RDB, 2017 WL 4404428, at *4 (D. Md. Oct. 4, 2017) (internal quotation marks and citations omitted). Defendant argues that Plaintiff's MCDCA claim cannot survive because Plaintiff fails to satisfy the heightened pleading standard of Rule 9(b) and because she fails to sufficiently plead knowledge with respect to her MCDCA claim. ECF No. 16-1 at 10–11. Plaintiff contends that no heightened pleading standard applies to MCDCA claims, but that even if they did apply, Plaintiff has met the required standard. ECF No. 17 at 15–18.

Though this Court has previously found that "[s]tatutory consumer protection claims, like claims under the MCDCA and portions of the MCPA based on non-fraudulent but unfair or deceptive conduct, are not required to be pled with particularity," *Gillis v. Household Fin. Corp. III*, No. 18-cv-3923-GJH, 2019 WL 3412621, at *8 (D. Md. July 29, 2019) this rationale does not apply to the instant case. Here, Plaintiff's specific allegations, including that Defendant "knowingly misrepresented" its right to collect past due balances and late fees, ECF No. 15 ¶ 103 (MCDCA Claim), that its actions were "willful" and that it had "direct notice of the wrongfulness of its collection efforts," ECF No. 15 ¶ 104 (MCDCA Claim), and that it "misrepresent[ted] to Plaintiff the application of her payments, ECF No. 15 ¶ 109(A) (MCPA

claim), all sound in fraud and are distinct from the "non-fraudulent but unfair or deceptive conduct" discussed in *Gillis*. *See Johnson v. Nationstar Mortg., LLC*, No. 14-cv-2536-GJH, 2014 WL 5377636, at *3 (D. Md. Oct. 21, 2014) ("Because the . . . MCPA claim sounds in fraud, it is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b).") (internal quotation marks omitted); *see also Hershey v. MNC Fin., Inc.*, 774 F. Supp. 367, 375–76 (D. Md. 1991) (holding that Rule 9(b) applies to "all averments of fraud" and that [i]t's application should depend on the substance of a plaintiff's allegations, not upon the guise in which he portrays them.").

Nonetheless, Plaintiff has sufficiently alleged an MCDCA claim against Defendant. In Count III, Plaintiff alleges that "Defendant knowingly misrepresented its right to collect past due balances and late fees on the Mortgage for the period beginning in July 2019 through the present, where no such right existed[.]" ECF No. 15 ¶ 103. Specifically, Plaintiff alleges that after she entered into the final loan modification agreement, Defendant stopped payments on her check from the Rejected Payments and did not apply them to the mortgage, despite Plaintiff's request to do so in or around September 2019, and that despite continuing to timely pay her mortgage following the modification, Defendant "sent Plaintiff multiple mortgage statements showing her thousands of dollars past due." *Id.* ¶¶ 47–50. Plaintiff also alleges that she requested the application of the Rejected Funds to the Mortgage, Defendant told Plaintiff they would be applied, but Defendant failed to adjust her balances, including the purported delinquent balance listed on her statement. *Id.* ¶ 51. After Plaintiff, through counsel, sent Defendant another Notice of Error on or about November 25, 2019, Defendant responded on or about December 23, 2019 indicating that the Rejected Payments had been applied to Plaintiff's balances from July–December 2019, "though Plaintiff had already made each of those payments." *Id.* ¶¶ 51–55.

"Despite Defendant's admission of some error and promise to correct it," Plaintiff additionally alleges that Defendant continued to indicate that Plaintiff was past due "in excess of $5,00 and late fees," which continued through on or about January 26, 2021, when Defendant, through Cenlar, sent Plaintiff a letter informing her that 'she was in default under the terms of [her] mortgage" and that Defendant had "the right to invoke foreclosure based on the terms of [her] mortgage contract." *Id.* ¶¶ 59–64. Plaintiff's allegations here contain "particular allegations of the time, place, speaker, and contents of the allegedly false acts or statements" as required under Rule 9(b). *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 249–50 (D. Md. 2000).

Defendant also argues that Plaintiff fails to sufficiently plead knowledge with respect to her MCDCA claim, *see* ECF No. 16 at 11, but "knowledge[ ] and other condition[s] of mind of a person may be averred generally." *Beuster v. Equifax Information Services*, 435 F. Supp. 2d 471, 480 (D. Md. 2006) (citing Fed. R. Civ. P. 9(b)). Because Plaintiff has sufficiently alleged facts to satisfy the heightened pleading standard under Rule 9(b), Plaintiff's MCDCA claim survives.

### D.  MCPA

Plaintiff likewise asserts a violation of the MCPA, but under three distinct subsections of the statute: (1) Section 13-301(14)(iii), (2) Section 13-301(1), and (3) Section 13-301(3). ECF No. 15 ¶ 108–109. Pursuant to Section 13-301(14)(iii), "[u]nfair or deceptive trade practices include any . . . [v]iolation of a provision of . . . the Maryland Consumer Debt Collection Act[.]" As such, "[a] violation of the MCDCA is a per se violation of the MCPA." *Hawkins v. Kilberg,* 165 F. Supp. 3d 386, 390 (D. Md. 2016) (citing Md. Code Ann., Com. Law § 13–301). Plaintiff alleges a violation of Section 13-301(1) based on various misrepresentations of Defendant's right to collect past due balance and late fees from Plaintiff, along with misrepresentations with respect to Plaintiffs monthly payments, her escrow funds, status of her homeowners' insurance

and the need for forced-place insurance, and its right to invoke foreclosure. *See* ECF No. 15 ¶¶ 109A–E. She also alleges a violation of Section 13-301(3) based on Defendant's "failure to inform Plaintiff that it had failed to pay her homeowners' insurance premium and that it had failed to correct its error after receiving notice." *Id.* ¶ 110.

"To state a claim under the MCPA, a plaintiff must adequately plead that: (1) the defendant engaged in an unfair or deceptive practice or misrepresentation, (2) the plaintiff relied upon the misrepresentation, and (3) doing so caused the plaintiff actual injury." *Barr v. Flagstar Bank, FSB*, 303 F. Supp. 3d 400, 416 (D. Md. 2018). An unfair, abusive, or deceptive trade practice includes a "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers," or a "[f]ailure to state a material fact if the failure deceives or tends to deceive." Md. Code, Com. Law §§ 13-301(1), (3). Plaintiff alleges misrepresentation with respect to her MCPA claims, and "[f]alse statement and misrepresentation claims arising under the MCPA are subject to the heightened pleadings requirements" under Rule 9(b). *See Artis v. T-Mobile USA, Inc.*, No. 18-cv-2575- PJM, 2019 WL 1427738, at *2–3 (D. Md. Mar. 29, 2019) (citing *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013)).

Here, by alleging the MCDA claims as discussed above, Plaintiff also alleges that Defendant has engaged in an unfair or deceptive practice or misrepresentation. Further, Plaintiff sufficiently alleges that she relied on Defendant's misrepresentations by (1) continuing to make payments based on Defendant's instructions, even though Defendant failed to apply the Rejected Payments, *see* ECF No. 15 ¶¶ 51, 57–58, (2) paying several months of excess mortgage insurance premiums, *see id.* ¶¶ 61–62, (3) continuing to make escrow payments with the expectation that the payments would go towards the maintenance of her homeowners' insurance,

21

*see id.* ¶¶ 67–70, and (4) refraining from purchasing new homeowners' insurance because she was already making payments to Defendant for the same, *see id*. ¶¶ 71–73. Because of Defendant's actions, Plaintiff "suffered severe emotional distress, manifest through symptoms including but not limited to, depression, anxiety, loss of sleep, crying, and chest pains," *id.* ¶ 76, and Plaintiff was "forced to take time off from work to address Defendant's ongoing servicing failures," which impacted her job performance. *Id.* ¶ 80. Additionally, Plaintiff filed for Chapter 13 bankruptcy "motivated solely by the fear off foreclosure due to Defendant's persistent inaccurate delinquency characterization," which also caused "substantial harm to her ability to secure credit." *Id.* ¶ 81. Taken together, Plaintiff's MCPA claim also survives Defendant's Motion to Dismiss.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss Plaintiff's Amended Complaint, ECF No. 16, is granted, in part, and denied, in part. A separate Order shall issue.

Date: <u>January 12, 2022</u>                                    <u>    /s/                                        </u>
                                                                    GEORGE J. HAZEL
                                                                    United States District Judge